# EXHIBIT B

# MASTER SOURCING AGREEMENT

This Master Sourcing Agreement ("Agreement") is made and entered into on January 5, 2019 (the "Effective Date"), by and between the party respectfully designated as "Seller" and the party respectfully designated as "Buyer" on the signature page hereto, with each having their principal places of business at the respective addresses set forth on the signature page hereto.

WHEREAS, Seller currently sources and sells apparel and related goods, including all packaging, components, materials, containers, and labels in connection therewith, and services related thereto (collectively, "Goods");

WHEREAS, Buyer and Seller desire to enter into an agreement whereby Seller would source and/or sell Goods to Buyer:

NOW, THEREFORE, in consideration of the mutual covenants contained herein, Buyer and Seller (each, a "party" and collectively, the "parties") hereby agree as follows:

## GENERAL SOURCING TERMS AND CONDITIONS

The following terms and conditions will apply to all transactions involving the sale of Goods between Buyer and Seller named on the signature page of the Agreement.

**1. Contract Terms; Entire Agreement.**

**a.** Buyer and Seller may create binding contracts for the purchase and sale of Goods by exchanging one or more written or electronic communications by any commercially reasonable means showing agreement as to the following items: description of Goods, price, quantity, date of delivery, and means of shipment (each, a "Contract"). The terms of any such Contract between Buyer and Seller will be comprised exclusively of the foregoing items, the terms of the Agreement, any supplements or addenda identified herein or therein, the terms of the Buyer shipping guide (as delivered to Seller prior to or contemporaneous with the date hereof), and any other applicable policies, manuals, guidelines, specifications and other instructions which have been or may from time to time be furnished to Seller including, without limitation, letters of credit by or on behalf of Buyer or Vendor Terms Policy (each of which is incorporated herein by reference), and such other terms and conditions contained in the parties' written or electronic communications which are agreed upon in writing by the parties. Each Contract hereunder shall be deemed separate and severable and not part of one or more installment Contracts. Except as otherwise provided for in this Agreement or in a separate writing after this date, if there is a conflict between the terms of the Agreement and any other document(s), the terms of the Agreement shall control.

**b.** With respect to any such Contract, the terms identified in Section 1.a. will constitute the complete and exclusive statement of the terms and conditions between the parties, and supersede and merge all prior proposals, understandings and all other agreements, oral and written, between the parties with respect to the purchase and sale of the Goods that are covered by such Contract. Notwithstanding the foregoing, the terms of the Agreement may not be modified by the terms of a Contract, unless the parties provide expressly otherwise in writing in accordance with this Section 1.b. The Agreement may not be modified or altered except by a written instrument duly executed by both parties, and any proposals for any additional or different terms contained in communications from Seller which are not signed by Buyer are objected to by

Buyer without further notification. In addition, no course of dealing or manner of performance will constitute a waiver of or modify against Buyer any of such terms and conditions. No amendment, modification or other change to the Agreement will be effective unless evidenced by a writing signed by authorized representatives of both parties. Nothing in the Agreement will require Buyer to enter into Contracts for the purchase of Goods from Seller.

2. **Production Management/Sourcing Services and Associated Terms.**

a. Services. Seller will provide production management services for Buyer, which shall include evaluating the existing sourcing matrix (factories, mill, trim and other raw material suppliers), developing alterative sourcing considerations, product costing and re-engineering, order management, color and pre-production fit approvals, fabric prepositioning and management, production scheduling and monitoring, factory compliance audits and management, importation, customs clearance and trade management, and delivery services (last mile and warehousing services excluded).

b. Licensees. All sales for the benefit of Seller licensees will be to Seller, with Seller being responsible for the sale to and collection from the licensees.

c. Factories and Other Supplies. Buyer shall have the right to source with other parties, but during the term of this Agreement and for a period of one (1) year from the date of expiration or termination hereof and each of the Contracts entered into pursuant hereto, Buyer may not work directly or through an agent or other third party with any factories or other suppliers that (i) Seller has directly sourced following the date of this Agreement, and (ii) is not an factory or other supplier that Seller (or its predecessor owner, L Brands) has utilized through its historical relationship in connection with the La Senza business; provided, however, that the foregoing restrictions shall not apply if and after the Buyer terminates this agreement pursuant to section 19(b) or 19(c) below.

e. Continuous Improvement Efforts. Seller cannot guarantee that existing factory pricing will be maintained on a go-forward basis, but it will work with Buyer for alternative costing opportunities to drive reductions including, but not limited to, alternative factories, mills, technical design, and production methodologies. Seller will provide factory cost data to Buyer to facilitate joint efforts to accomplish the mutual goal of maintaining or reducing existing costing. In addition, Seller will help evaluate the US staffing structure of Buyer and their roles and responsibilities to determine if there are opportunities for some of these functions to be performed in-region at a lower cost. To the extent that this results in additional staffing being required by Seller to support, the markup rate will be reevaluated, with a commensurate increase or decrease being mutually agreed to by Seller and Buyer at that time. Both parties agree to work on continuous improvement efforts throughout the relationship and acknowledge that it may result in adjustments to the abovementioned services fee structure in Section 2.d.

f. Sampling and Development Charges. Development and sampling charges

incurred by Seller will be passed through to Buyer without markup by Seller and will not be included in product costing/margin, with Seller bearing the financial responsibility therefor.

g. IT Systems Integration. Seller and Buyer will endeavor to develop full EDI connectivity (including CPOs, invoicing, ASNs) as soon as practical. Due to the high transaction volume and manual work needed by Seller to process these transactions in the interim, Buyer shall cover the cost of up to four (4) temporary employees during the period of manual processing until EDI connectivity is in place.

**3. Exchange of Communications.**

With respect to electronic communications under Section 1 and Section 2, each party may electronically transmit to or receive from the other those electronic data interchange ("EDI") transaction sets on which they agree in writing. Each party will adopt, and the other will keep confidential, an electronic identification consisting of symbols or codes to be contained in or affixed to each such transmission for purposes of authentication, and each transmission so authenticated shall be deemed to be signed and in writing. Each party will implement security procedures reasonably sufficient to verify that communications between the parties are authentic and authorized, to detect errors in transmission or content, and to provide for protection against improper disclosure or access. Neither party will be responsible for a communication received from the other party in unintelligible or garbled form, provided the receiving party gives prompt notice to the originating party (if identifiable from the received document) of any such occurrence. With respect to any Contract evidenced in an electronic manner contemplated by the Agreement, the parties expressly waive any defense they may have under any law requiring Contracts to be evidenced by a signed writing.

**4. Invoicing and Packaging.**

Seller shall ensure that all Goods delivered to Buyer under the Agreement will be invoiced and packaged in accordance with the terms of the Contract relating thereto, including the provisions of the Agreement and terms and instructions incorporated herein by reference. In addition to those provisions, terms and instructions, all packages, correspondence, packing slips and invoices will display complete order number, department (class) number, style number and quantity, and garments on hangers will be shipped by style, color and size (without substitution). All invoicing and packaging will comply with Laws and Regulations (as hereinafter defined in Section 11.b.), be adequate to preserve and protect the Goods, and satisfy the requirements of the carrier being used for shipment.

**5. Verification of Country of Origin and Other Related Matters.**

Within ten (10) days of receipt of an order, Seller shall inform Buyer of the 'Country of Origin" of merchandise which Seller is required to disclose on the merchandise in compliance with federal laws and rules and regulations thereunder, including without limitation the Wool Products Labeling Act and the Textile Fiber Products Identification Act, (hereinafter "Country of Origin"), and Seller shall thereafter continually inform Buyer of any and all changes to the Country of Origin as soon as Seller becomes aware of any such changes or modifications as are required to comply with such laws or regulations. Seller shall, within ten (10) days of Buyer's request, provide Buyer with documentation substantiating the Country of Origin disclosed by the Seller. Buyer reserves the right to cancel any order if the Country of Origin is unacceptable to Buyer.

**6. Labor Standards.**

Seller acknowledges and agrees that it is responsible for ensuring that each of its owners, managers, employees, vendors, subcontractors, suppliers, representatives, agents, factories, and other facilities and third parties that participate in the manufacture or provision of the Goods complies with Buyer's Business Policies, including without limitation, Buyer's Labor Standards.

**7. Delivery.**

Seller shall ensure that all Goods delivered to Buyer under the Agreement will be shipped in accordance with the terms of the Buyer's shipping guide or any other applicable policies, manuals, guidelines or other instructions which have been furnished to Seller by or on behalf of Buyer prior to or contemporaneous with the Agreement (each of which is incorporated herein by reference) and, in the absence of specific instructions to the contrary (including, without limitation, in any Seller Terms Policy), if being shipped within the U.S., FOB point of destination specified by Buyer, or if being imported into the U.S. or Canada, Incoterms 1990: "DDP destination" specified by Buyer (or, if none is specified, to the central distribution facility of Buyer in __________________, or, if changed, then to another central distribution facility, as notified by Buyer). For the sake of clarity, title and ownership of Goods, including all risk of loss associated therewith, shall transfer to Buyer upon delivery to the destination specified in the relevant Contract, or as otherwise notified in accordance with this subsection.

**8. Inspection.**

Seller hereby acknowledges that Buyer will rely on Seller's representations and warranties with respect to the Goods and will not be obligated to unpack and inspect them before resale. Buyer's payment for, retention, use or acceptance of Goods will be deemed neither a waiver of Buyer's right to inspect them at any reasonable time or place and in any reasonable manner nor a waiver of any breach of a representation or warranty by Seller.

**9. Notice of Defect or Breach.**

Buyer may give Seller notice of any defect or breach *in* any reasonable manner, and any such notice will be considered timely if made within a reasonable time after discovery by Buyer or notification to Buyer from its customer. Buyer waives no remedies applicable to any defect or breach not identified in any such notice.

**10. Nonconforming Shipments.**

In addition to any other rights and remedies of Buyer stated herein, Buyer may exercise any of the following rights with respect to nonconforming delivery of Goods: (a) reject (or revoke acceptance of) the entire shipment; (b) accept the entire shipment; or (c) accept any number of commercial units (i.e., an item of the Goods that can be sold at retail) and reject (or revoke acceptance of) the balance of the shipment. Any Goods so rejected/revoked may, at Buyer's option, be returned to Seller for full credit, resold for Seller's account (less Buyer's reasonable expenses) in any reasonable manner, or stored for Seller's account pending Buyer's receipt of reasonable instructions as to their disposition. Notification that goods are considered as nonconforming shall be promptly provided to Seller, but no later than sixty days from date of delivery. Upon return to Seller or transfer to third party for disposition, Seller will bear all risk of loss associated with rejected/revoked Goods, and will promptly reimburse Buyer for all unrecovered reasonable expenses incurred by Buyer in connection therewith. Goods shall not be considered as nonconforming if amount delivered is within +/- 5% of the units listed on the relevant Contract and/or delivered within +/- 10 business days of the requested shipment date.

**11. Representations and Warranties.**

In addition to and without prejudice to other warranties of Buyer, express or implied by law, Seller represents and warrants to Buyer that:

a. The Agreement and each Contract created under the Agreement: (1) will constitute the legal, valid and binding obligation of Seller; (2) is enforceable in accordance with its terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally; and (3) violates no law, rule, regulation, contract or understanding to which Seller is subject.

b. Seller shall ensure that all Goods (including all materials or components thereof) delivered to Buyer under the Agreement will be: (1) new and unused; free from defects in materials, workmanship and fabrication; fit for the particular purposes or uses, if any, either specified by Buyer or otherwise known to Seller; in strict accordance with Buyer's specifications, descriptions, approved samples or prototypes including with respect to quality, size, description, color and dimensions, and otherwise in compliance with normal United States retailing standards with respect to such items as color, wash and light fastness; able to pass without objection in the trade, be of first quality and conform to all statements made by Seller or its agents or contained in Seller's advertising or promotional material; (2) free of any security interest, lien or other encumbrance of any kind; (3) tested, produced, labeled, packaged, shipped and invoiced in compliance with the Agreement, the applicable Contract and with Buyer's applicable policies, manuals, guidelines or other instructions which have been or may from time to time be furnished to Seller (each of which is incorporated herein by reference) and in compliance with *all* laws and/or regulations of the United States, or of any other jurisdiction, applicable to Seller, the Goods (including all materials or components thereof) or to the conditions or process of their manufacture, whether or not specifically referred to herein and whether relating to country of origin, product content or quality, safety, environmental matters, or otherwise ("Laws and Regulations") and Labor Standards, including without limitation the foreign, domestic, federal, state and local laws, regulations and/or standards relating to the Goods; (4) prepared for importation and/or imported in compliance with Laws and Regulations, including without limitation all regulations and policies of the United States and Canada, including those of the U.S. and Canadian Customs Service in effect from time to time (each of which is incorporated herein by reference); and, without limiting the foregoing; (5) free of infringement or violation of any United States or foreign patent, trademark, trade name right, copyright or trade secret, right of publicity or privacy right or any other proprietary, intellectual property, industrial property, Contract or other right held by any third party (provided that Seller shall not be in breach hereof to the extent that such infringement or violation results from designs or specifications provided by Buyer). Seller will promptly provide Buyer and its agents with any information reasonably requested by Buyer and its agents in order to verify compliance with the foregoing.

c. Seller is able to comply and has fully complied with the Agreement, and that Seller, its employees, agents, vendors, subcontractors and suppliers are able to comply and have fully complied with all Laws and Regulations and Labor Standards, including without limitation country of origin and other requirements of the U.S. Customs Service and related agencies, and all similar requirements of other applicable jurisdictions, with respect to all Goods sold to Buyer under the Agreement.

d. Seller has procured and shall maintain such licenses and permits as are required to fully perform the Agreement and any Contract created under the Agreement.

e. Seller has employed or will employ an adequate number of persons to provide the services contemplated herein and such employees have or will have the requisite skills and experience to provide such services in a commercially reasonable manner.

f. Without limiting any of Seller's obligations hereunder, Seller will attempt to procure for Buyer the benefit of any warranties or other rights conferred on Seller by its vendors, subcontractors and suppliers. Seller will promptly provide Buyer or its designated representative with any information reasonably requested by Buyer in

order to verify compliance with this Section 11.

g. Seller will assign to Buyer all drawback refunds available from the Canada and/or the U.S. Customs Service in respect of Goods delivered by Seller pursuant to the Agreement and paid for by Buyer, and Seller will cooperate with Buyer in taking all steps reasonably necessary to obtain any such refund.

In addition to and without prejudice to other warranties of Buyer, express or implied by law, Buyer represents and warrants to Seller that the Agreement and each Contract created under the Agreement: (1) will constitute the legal, valid and binding obligation of Buyer; (2) is enforceable in accordance with its terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally; and (3) violates no law, rule, regulation, contract or understanding to which Buyer is subject.

**12. Price; Payment Terms.**

Quoted prices will include all charges which may be imposed under the terms of any Contract under the Agreement, and in no event will any extra charges of any kind be allowed (including, without limitation, service charges, taxes, duties, cartage, boxing, freight or carrying charges) unless otherwise agreed in writing by Buyer. Subject to the last sentence of this subsection, unless another payment schedule is expressly contained in a Contract created under the Agreement, payment terms will be payment in U.S. Dollars, immediately available funds, Net 60 days. All dating begins on the Buyer's receipt of Goods (as determined per the applicable Incoterms shipping term). U.S. Dollar equivalents of any invoice permitted by Buyer to be stated in a foreign currency will be determined at the selling rate for converting such currency into U.S. Dollars, as published in The Wall Street Journal, for the Contract date or, if such date is not a banking day, on the last banking day prior thereto. Should there be a significant decline in Buyer's financial metrics, Seller shall have the ability to adjust payment terms with a ten (10) day prior written notice for future Contracts with Buyer, as Seller deems prudent in its reasonable judgment as a creditor, including up front terms; provided that the parties shall negotiate in good faith to define the objective criteria that would provide a basis for Seller altering these payment terms.

**13. Raw Materials Management.**

Pursuant to this Agreement, Buyer may request from time to time that Seller preposition fabric, trim, yarn, and/or other raw materials (collectively the "Prepositioned Raw Materials") on their behalf which are not directly related to an existing Contract under this Agreement, but for one (or several) to be placed in the near future. If Seller confirms acceptance of these requests, Buyer shall issue a written (or electronically prepared) Raw Material Commitment or other similar document memorializing the request and affirming their liability for the Prepositioned Raw Materials prior to Seller taking such action. Buyer hereby acknowledges that Seller may refuse such requests in their sole judgment and, if accepted, shall have no responsibility or obligation with regard to the Prepositioned Raw Materials until a corresponding Raw Material Commitment from Seller has been received. At or prior to the expiration of a period of nine (9) to twelve (12) months from the day the Raw Material Commitment is received by Seller (such period depending on fabric type and/or shelf life, as communicated by Seller at the time the Raw Material Commitment is accepted), Buyer shall either settle the liability via payment for the Prepositioned Raw Materials or cancel the Raw Material Commitment and contemporaneously issue a Contract for the purchase of Goods which fully utilizes the underlying Prepositioned Raw Materials. Any cancelled Contracts which result in unutilized Prepositioned Raw Materials shall be replaced with a Raw Material Commitment under this subsection, in which case the calculation of the settlement requirement described above shall begin on the earliest receipt of any Raw Material Commitment or Contract related to the relevant Prepositioned Raw Materials, cancelled or otherwise. In any case, full payment for all Prepositioned Raw Materials under this provision shall be made within one full year of the initial creation of the obligation or when the aggregate liability for all Prepositioned Raw Material under this provision exceeds $10,000,000.00 USD, whichever occurs first.

**14. Chargebacks and Other Adjustments.**

Reasonable chargebacks may be imposed by Buyer to compensate it for the cost and expense resulting from any one or more of the following events: failure to pay transportation or importation costs; payment by Buyer of any extra charges of any kind originally contemplated to be paid by Seller (including without limitation any interest or service charges, taxes, duties, cartage, boxing, freight or carrying charges); absence or illegibility of packing lists; Goods received without strict compliance with shipping and packing instructions; incorrect or incomplete labeling, sizing, prepackaging or pre-ticketing, or inconsistent quantities per package; incorrectly hung garments; failure to meet quality or other standards; recalls; returns to Seller; storage charges; improper invoicing; excessive insurance charges; early or late delivery which results in Goods being deemed nonconforming but which Buyer still accepts; overages, shortages or unauthorized partial receipts or substitutions which results in Goods being deemed nonconforming but which Buyer still accepts; concealed damage, poor quality, substandard or soiled Goods; handling and freight charges for any store recalls; or any other breach of the Agreement or any Contract created under the Agreement. For early or late deliveries which do not result in Goods being deemed nonconforming, Buyer shall have the right to chargeback 1% of sales price per day, not to exceed 10% of sales price in total, without the written consent of Seller.

**15. Indemnity and Insurance.**

a. To the extent attributable to the negligence, recklessness, or intentional misconduct of Seller, their suppliers and their respective directors, officers, employees, agents, successors and assigns, Seller agrees to indemnify, defend and hold harmless Buyer and its affiliates, and their respective directors, officers, employees, agents, customers, successors and assigns, from and against any and all claims, liability, loss, damage, penalty and expense (including reasonable attorneys' fees, and other reasonable professional fees) relating to, based upon or resulting from any claim or proceeding pertaining to the Agreement or any Contract created under the Agreement or any Goods delivered to Buyer, whether arising before or after delivery, involving but not limited to: infringement or violation of any patent, trademark, trade name, copyright, trade secret, right of publicity or privacy right or any other proprietary, intellectual property or industrial property right (other than any such infringement or violation to the extent resulting from designs and/or specifications provided by Buyer); unfair competition; violations of Laws and Regulations; personal injury or property damage; failure of Goods to comply with any express or implied warranties of Seller; or any breach of the Agreement or any Contract created under the Agreement. Buyer, at its option and expense, may participate in the defense of any such claim or proceeding. In no event shall Seller enter into any settlement without Buyer's prior written approval, which shall not be unreasonably withheld. Buyer's approval of any settlement shall not be deemed a waiver by Buyer of any insurance coverage that may be available to Buyer.

b. Unless specifically waived by Buyer in writing upon request of Seller, Seller shall maintain, at Seller's expense, commercial general liability insurance with an insurance company licensed to do business in the United States earning a minimum rating of A, Financial Size X in Best's Reports. Such insurance shall provide for minimum limits of US$1,000,000.00 bodily injury and US$1,000,000.00 property damage per occurrence, with a products liability aggregate limit of at least US$5,000,000.00, coverage for contractual indemnification obligations, and shall be primary over any and all other collectible insurance. All such policies shall provide that coverage thereunder shall not be terminated or materially changed without prior written notice to Buyer and Buyer shall be furnished original certificates of insurance and evidence of renewals upon request. Buyer, in its sole discretion, reserves the right to request additional coverage from time to time. The purchase of such insurance and furnishing of such certificates shall

not limit Seller's obligations hereunder or in any way modify Seller's agreement to indemnify Buyer as set forth herein. In the event Seller purchases insurance of the "claims made" variety, Seller shall purchase an extended reporting period tail, or maintain the claims made policy, so that Buyer is protected from any and all claims brought against Buyer for a period of not less than three (3) years from the date of last purchase agreement between Seller and Buyer.

c. Buyer agrees to indemnify, defend and hold harmless Seller and its affiliates, and their respective directors, officers, employees, agents, customers, successors and assigns, from and against any and all claims, liability, loss, damage, penalty and expense (including reasonable attorneys' fees, and other reasonable professional fees) relating to, based upon or resulting from any claim or proceeding pertaining to the exercise of rights and remedies of the Seller pursuant to Section 19(f).

**16.    Force Majeure.**

Neither party will be liable for failure to perform under the Agreement or any Contract created under the Agreement to the extent such failure is caused by any fire, strike, act of God, terrorism, war, anti-dumping proceedings or similar action, authorization of law, embargo, accident or other cause beyond the reasonable control of the affected party and not correctable or avoidable through exercise of commercially reasonable means. A failure of Seller to perform is neither within this Section nor excused for any other reason, whether asserted as force majeure, failure of presupposed conditions, or otherwise, if and to the extent Seller's failure is in turn caused by any deficiencies of hardware, imbedded software, chips and firmware, operating systems, peripherals, software, networks, and other devices and systems owned, leased, licensed or used by Seller (or by a third party upon whom Seller relies directly or indirectly), in processing, utilizing or presenting, or by any deficiencies in accurately processing, utilizing, or presenting (including calculating, comparing, and sequencing, as well as all leap year calculations) date information (in *all* forms presently or anticipated to be or in fact in the future maintained, received or utilized during all periods contemplated by the Agreement) from, into, and between any times, days or periods in the twentieth and twenty-first centuries. If any such event or cause affects Seller's ability to perform, Seller will give notice thereof to Buyer within five (5) business days after any such occurrence, and if such inability continues for more than ten (10) business days after the date of notice, Buyer will have the right to terminate the affected Contract, and the costs incurred by Seller in connection with any such termination will be borne by Seller. To the extent that the effect of a force majeure event merely results in the late delivery of Goods, but not more than 15 days, both parties agree that the sole remedy shall be a reduction in the price of the Goods as mutually agreed to by both parties at the time of occurrence.

**17.    Confidentiality.**

Seller, for itself and its affiliates, principals, consultants, employees, agents, vendors, subcontractors and suppliers, agrees to (and shall ensure that each of the foregoing persons and entities agrees to) treat as strictly confidential all specifications, drawings, samples, models and business information provided by Buyer to Seller. As between Buyer and Seller, such information will remain the exclusive property of Buyer and will only be disclosed to the extent reasonably necessary for Seller's employees and agents to perform Seller's obligations hereunder, and Seller will take all reasonable measures to assure that the recipients of such information protect the confidentiality thereof. Without the prior written consent of the other party, which may be withheld in such other party's discretion, neither party will make any public disclosure of the Agreement, any Contract created under the Agreement, or any relationship whatsoever between Buyer and Seller, or any confidential information of the other party, except as required by law (provided that (i) the disclosing party provides the non-disclosing party prior written notice of any such proposed disclosures to be made under law and gives the non-disclosing party a reasonable opportunity to modify such proposed disclosures to be made under law and (ii) in any case, such proposed disclosures to be made under law shall not include any

sensitive financial information regarding the non-disclosing party or the terms of the Agreement or any Contract created under the Agreement) . Upon termination of the Agreement, or at any time upon a party's written request, the non-requesting party shall promptly return to the requesting party or destroy (and confirm such destruction in writing as promptly as practicable) all forms of the requesting party's confidential information, including, without limitation, copies. Each party acknowledges that the information protected by this Section is unique and that monetary damages would be insufficient to compensate the other party for any breach of this Section by such party or its principals, affiliates, employees or agents or any other recipients. Accordingly, each party agrees that, in addition to any other available remedy, each party will be entitled to injunctive and other special and equitable relief in connection with any such breach. Each party shall remain primarily liable and responsible for the acts and omissions of its affiliates, principals, consultants, employees, agents, direct and indirect vendors, subcontractors and suppliers, and agrees to incorporate into its agreements with, its direct and indirect vendors, subcontractors and suppliers, and to enforce for its benefit and the benefit of the other party, the terms of this Section. Each party agrees that any breach of this Section is a material breach. The timing and content of any press releases, legal disclosure or public announcements regarding any aspect of this Agreement or any transaction contemplated hereby to the financial community, government agencies (including any filings made with the Securities and Exchange Commission), the general public or otherwise must be agreed to in writing by each party prior to any such disclosure.

**18. Intellectual Property.**

a. If Buyer provides the designs for any Goods to be manufactured or sold by Seller, as between the Buyer and Seller, the designs shall remain the property of Buyer, and Seller shall acquire no right, title or interest in or to any such designs or any trademarks, service marks, trade dress, patents, labeling, software (including, without limitation, source code), packaging, hang-tags, trade names, distinctive words, logos, drawings, art work, pictures, colors, formulas, designs, design models or copyrights, derivations or adaptations thereof, or any marks or works similar thereto or any know-how, trade secrets or other intellectual property relating to any Goods (including without limitation, the design, manufacture, marketing or safe thereof) (collectively, the "Intellectual Property"), in each case to the extent provided by Buyer or based on designs provided by Buyer. If Seller develops or provides the designs for any Goods to be manufactured or sold by Seller, then Seller shall retain rights to the designs and all associated Intellectual Property; however, Seller shall acquire no rights to Buyer's Intellectual Property attached to, or used in connection with such Goods, as to which Buyer retains and reserves all rights. Further, if any design constitutes Buyer's modification of a design provided by Seller, the resulting modification shall become Buyer's Intellectual Property. When Buyer's Intellectual Property is attached to, or used in connection with any Goods made from Buyer's designs, Seller shall not, in perpetuity, manufacture, sell, market, promote, advertise or distribute to any third party such Goods for so long as such Intellectual Property is attached or used in connection with such Goods.

b. Seller agrees not to manufacture, market, distribute, sell or otherwise transfer any Goods that bear or use Buyer's Intellectual Property to third persons (other than third persons directed by Buyer) without first obtaining the written approval of Buyer and physically removing each and every use of Buyer's Intellectual Property from the Goods.

c. Except in accordance with Buyer's written policies regarding same which are incorporated herein by reference, Seller shall not sell, market, distribute or use for any purpose or permit any third party to sell, market, distribute or use for any purpose any Goods or promotional or packaging material relating to Goods which are damaged, seconds, defective, dated or out of style, fail to meet Buyer's

specifications or quality standards in the Agreement, or are otherwise rejected by Buyer. In the event of a conflict between this Agreement and Buyer's written policies solely with respect to the subject matter of the preceding sentence, the written policies shall control.

d. Seller shall not make any unlicensed use of, or file any patent application covering or application for registration of, or claim any other proprietary right in or to, any of Buyer's Intellectual Property.

e. Buyer and Seller agree that all material, including without limitation all artwork and designs, created by Seller or any of its affiliates or any other person or entity retained or employed by Seller or any of its affiliates, based on Buyer's designs or that otherwise are derived from Buyer's Intellectual Property, shall be works made for hire within the meaning of the United States Copyright Act and shall be the property of Buyer and, without limiting any of Buyer's other rights with respect thereto, Buyer shall be entitled to assign, use and license others to use such material, subject to the provisions of the Agreement and unencumbered by moral rights. To the extent any of the foregoing is not a work made for hire or rights in the materials do not automatically accrue to Buyer, Seller hereby irrevocably assigns and agrees to assign to Buyer, its successors and assigns, the entire right, title and interest in perpetuity throughout the world in and to any and all rights, including all copyrights and related rights in such Intellectual Property, which Seller and the author of such Intellectual Property warrant and represent as being created by and wholly original with the author. Where applicable, Seller agrees to obtain any other assignments of rights in the Intellectual Property from the author or third parties in favor of Buyer, its successors and assigns. Notwithstanding the foregoing, to the extent any Goods are "off the shelf", "market body", non-proprietary, or otherwise not original designs, then this subsection (e) shall not apply.

f. Seller agrees to incorporate into its agreements with its direct and indirect vendors, subcontractors and suppliers, and to enforce for its benefit and the benefit of Buyer, the terms of this Section.

**19. Term, Termination, and Remedies.**

a. This Agreement will remain in effect until terminated by either Buyer or Seller upon giving written notice to the other at least 180 days prior to the date of such termination. No such termination will operate to relieve any party of its obligations under any contract entered into hereunder, whether or not such contract was fully performed at the time of termination. Following the termination of this Agreement and each of the Contracts entered into pursuant to this Agreement, and subject to clause (f) below, the Seller shall return the Letter of Credit to Buyer or, at Buyer's instructions, the issuer of such Letter of Credit, together with instructions that Buyer irrevocably consents to the termination of such Letter of Credit , it being understood that there shall be no obligation on the part of Seller to return such Letter of Credit until the completion thereof and the payment of all amounts owed and outstanding by Buyer in accordance with the terms hereof and thereof. Following the payment in full of all amounts then owed and outstanding under this Agreement or any Contracts entered into pursuant to hereto, and to the extent neither this Agreement nor any Contracts are then in effect, Seller shall promptly return the Letter of Credit to Buyer.[1]

b. Any Buyer or Seller shall have the right with respect to the other to terminate immediately the Agreement and/or any Contract created under the Agreement, in

   whole or in part, without liability, should the other become insolvent, make a general assignment for the benefit of creditors, suffer or permit the appointment of a receiver for its business or assets, become subject to any proceeding under any bankruptcy or insolvency law whether domestic or foreign or be wound up or liquidated (voluntarily or otherwise). In the event that Buyer cancels the Agreement pursuant to this Section 19(b) of this Agreement, it shall not be subject to the re-sourcing restrictions described in Section 2(c) above.

c. A party shall have the right to terminate this Agreement upon notice to the other party if such other party materially breaches this Agreement and has not cured the breach within thirty (30) days of receipt of notice from the non-breaching party. The foregoing shall be without prejudice to Seller's right to draw upon the Letter of Credit (as defined in Section 20) pursuant to its terms. In the event that Buyer cancels the Agreement pursuant to this Section 19(c) of this Agreement, it shall not be subject to the re-sourcing restrictions described in Section 2(c) above.

d. Buyer shall have the right to cancel immediately the Agreement, or at is option, any Contract, in whole or part, including without limitation any or all current and outstanding orders, whether or not in the process of manufacture, and to reject any orders or revoke acceptance of orders previously accepted, without liability, should any of the following occur:

(1) Seller, or any of its vendors, subcontractors or suppliers fails to perform any obligation required under Sections 5 hereof,

(2) After inspection of the facilities or records of Seller, or any of its vendors, subcontractors or suppliers as permitted hereunder, Buyer is unable to verify to its reasonable satisfaction compliance with Laws and Regulations or Labor Standards, including, without limitation, Canada and/or United States laws and/or regulations relating to the country of origin of or labor standards applicable to Goods produced for or sold to Buyer, or

(3) Seller, or any of its vendors, subcontractors or suppliers is determined to be not in compliance with or to have violated any Laws and Regulations or Labor Standards, including without limitation laws and/or regulations relating to the country of origin of or labor standards applicable to Goods produced for or sold to Buyer, or the laws and/or regulations of any country or countries wherein any portion of Goods contracted for by Buyer are to be manufactured, or appears on a published Canada and/or U.S. Customs list of targeted companies or suspected violators of Canadian and/or U.S. import laws.

(4) Notwithstanding the foregoing provisions of this Section 19.c., if with respect to any Contract (A) Seller has received a current written acknowledgment from Buyer or its agents that Seller has the capacity to comply with the requirements of Section 5 hereof, and (B)(i) Buyer or its agents inspected some or all of the Goods subject to such Contract while in production and Seller has received a written acknowledgment from Buyer or its agents that such inspection did not reveal noncompliance with Section 5 hereof, or (ii) Seller has received a written waiver from Buyer or its agents of the inspection of the Goods subject to such Contract, Seller shall be rebuttably presumed to have complied with Section 5 hereof with respect to such Contract.

e. Notwithstanding the foregoing, Buyer shall also have the right, without liability, to cancel immediately, in whole or in part, any Contract if Seller is, or any Goods

are not, in compliance with the Agreement, and to reject or revoke acceptance of any orders previously accepted, that are, or that have been produced or delivered, not in compliance with the Agreement.

**f.** In the event that Seller has commercially reasonable grounds for insecurity with respect to Buyer's performance, has communicated those grounds with specificity in writing to the Buyer and Seller has not received reasonable assurance of due performance within ten (10) business days after written demand, Seller may suspend performance under this Agreement or any additional Contracts entered into in accordance with the terms of this Agreement.

In the event that Buyer defaults on any of its payment obligations under this Agreement or any Contract entered into in accordance with the terms hereof, and in any such case, the Buyer has not fully performed its obligations under this Agreement or any Contracts entered into in accordance with the terms of this Agreement, ten (10) business days after a written demand to cure, Seller is entitled, and Buyer hereby authorizes Seller, to draw under the Letter of Credit and apply or retain in whole or in part the amounts received pursuant to the Letter of Credit to satisfy any and all obligations of Buyer that are then owed and outstanding (and together with all reasonable expenses, claims, fees (including reasonable attorneys' fees, other professional fees and other costs and expenses), losses, penalties, costs and damages suffered by Seller) (collectively, the "Buyer Obligations"). Only in the event that the aggregate amount of the Letter of Credit is insufficient to satisfy and discharge in full the aggregate amount of the Buyer Obligations following the exercise of the Sellers rights and remedies pursuant to this paragraph, the Seller shall be permitted to exercise any and all of its rights set forth under the L Brands Guarantee (defined below) along with other rights and remedies then available under equity or law.

For purposes of this Agreement, "L Brands Guarantee" means that certain letter agreement dated as of January [ ], 2019 by and among L Brands, Inc. and MGF Sourcing US, LLC, as the same may be amended, supplemented or otherwise modified from time to time.

**20. Letter of Credit Obligations**

a. **<u>Delivery of Letter of Credit</u>**. No later than May 1, 2019, Buyer shall deliver to Seller an unconditional and irrevocable standby letter of credit (the "Letter of Credit") issued by a Permitted Issuer and payable to Seller on demand as further described herein. Such Letter of Credit must be in form and substance reasonably satisfactory to Seller and Seller shall not be obligated to perform any services (other than pre-production planning services) pursuant to any Contract unless and until such Letter of Credit has been received by Seller. The Letter of Credit shall secure any and all payments under each Contract entered into pursuant to this Agreement and any such Contract and all other amounts owed by Buyer to Seller pursuant to this Agreement or any Contract. The Letter of Credit shall be payable to Seller upon demand made pursuant to presentation of an unconditional sight draft with a statement by Seller that Seller is entitled to draw thereunder pursuant to the terms of this Agreement and any Contract entered into in accordance with the terms hereof.

b. **<u>Amount of Letter of Credit</u>**.

i. Initial Letter of Credit. The amount of the Letter of Credit shall be in an initial amount equal to 50% of the Inventory Value (defined below). The foregoing being, the "Initial Letter of Credit".

ii. Updated Letter of Credit. Each month, following the delivery of the Applicable

Financial Information for the month ended May 31, 2019 and for each month ended thereafter, an updated Letter of Credit will be delivered in accordance with the following clauses (1) and (2), as applicable:

1. In the event that the Inventory Value, as set forth on the most recently delivered Applicable Financial Information, has increased, Seller may request, and the Buyer shall promptly deliver, an updated Letter of Credit such that the amount of the Letter of Credit is 50% of the Inventory Value determined by reference to the most recently delivered Applicable Financial Information. Not fewer than five (5) business days after Seller requests an updated Letter of Credit pursuant to this paragraph, Seller may withhold the performance of any services or other obligations of Seller under this Agreement or any Contract until such time as an updated Letter of Credit has been delivered (and it being understood that the withholding thereof shall not constitute a breach or default of Seller's obligations under this Agreement or any Contract). Failure to deliver an updated Letter of Credit as described herein shall constitute a material breach of this Agreement.

2. In the event that the Inventory Value, as set forth on the most recently delivered Applicable Financial Information, has decreased, Buyer may deliver to Seller an updated Letter of Credit such that the amount of the Letter of Credit is 50% of the Inventory Value determined by reference to the most recently delivered Applicable Financial Information. To the extent that Buyer delivers such updated Letter of Credit, Seller shall concurrently surrender the Letter of Credit then in its possession in exchange for receipt of the updated Letter of Credit delivered by Buyer in accordance with the foregoing. To the extent that Buyer delivers an updated Letter of Credit pursuant to this paragraph, Buyer may withhold the performance of any services or other obligations of Buyer under this Agreement or any Contract until such time as the Letter of Credit then in possession of Seller has been returned to Buyer (subject to Seller's receipt of the updated Letter of Credit as described herein and it being understood that the withholding thereof shall not constitute a breach or default of Buyer's obligations under this Agreement or any Contract). Failure to surrender the Letter of Credit as described herein shall constitute a material breach of this Agreement.

For purposes of this Agreement,

The term "Inventory Value" shall mean:

(1) to the extent the Buyer is party to an asset-based revolving credit facility (an "ABL Facility"), the amount of eligible inventory (or similar words of like import) set forth on the most recently delivered or required to be delivered Applicable Financial Information (or, in the case of the Initial Letter of Credit, the most recently delivered borrowing base certificate of the type referred to in Section (d)(iii)(1)), or

(2) to the extent the Buyer is not party to an ABL Facility, the book value of inventory set forth on the most recently delivered or required to be delivered Applicable Financial Information (or, in the case of the Initial Letter of Credit, the most recently available financial information of the type referred to in Section (d)(iii)(2)).

The term "Permitted Issuer" means a bank, insurance company, or company engaged in the business of making commercial loans, which person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000.

**Term of Letter of Credit**. The Letter of Credit shall have an initial expiration date no earlier than sixty days following the term of this Agreement and each of the Contracts entered into pursuant to the terms hereof.

c. **Remedies, Reinstatement**. The use, application or retention of the Letter of Credit, or any portion thereof, by Seller shall not prevent Seller from exercising any other right or remedy provided by this Agreement, any Contracts entered into or by equity or law. However, Seller shall first be required to proceed against the Letter of Credit before exercising any of its rights on the L Brands Guarantee. If any portion of the Letter of Credit is used, drawn on, applied or retained by Seller as set forth herein, Seller agrees, within ten (10) Business Days after the drawing thereof, to reinstate the aggregate amount of the Letter of Credit in an amount required under clause (a)(ii) above if as of such date, this Agreement or any Contracts entered into in accordance with the terms hereof are then in effect.

d. **Covenants.**

   i. Audited Financial Statements. Commencing with the fiscal year ended 2020 and for each fiscal year ended thereafter, as soon as available after the end thereof but in any event no later than 90 days after such fiscal year end, delivery to the Seller of audited financial statements of Buyer and its subsidiaries prepared on a consolidated basis inclusive of a consolidated balance sheet, statements of income or operations, shareholders equity and statement of cash flow together with a certification on the part of Buyer that such financial statements fairly present the financial condition of the Buyer.

   ii. Quarterly Financial Statements. Commencing with the first full fiscal quarter ended after the date hereof, and for each fiscal quarter ended thereafter, as soon as available after the end thereof but in any event no later than 45 days after each fiscal quarter of the Buyer, delivery to the Seller of a unaudited, internal consolidated balance sheet, statement of income or operations, statement of cash flow together with a certification on the part of the Buyer that such financial statements fairly present the financial condition of the Buyer.

   iii. Borrowing Base / Monthly Financials (the financial information required to be delivered pursuant to this Section (iii) being referred to herein as the "Applicable Financial Information"), commencing with the month ended May 31, 2019.

      1. to the extent the Buyer is party to an ABL Facility, contemporaneous with the delivery on a monthly basis of a borrowing base certificate to the lenders or administrative agent thereunder, delivery to Seller of a monthly borrowing base certificate of the type and scope delivered pursuant to the ABL Facility; provided that to the extent the ABL Facility requires borrowing base certificates less frequently than monthly, then the borrowing base certificate described in this clause (iii) shall be delivered promptly after delivery of such borrowing base certificate to such lender (in which case, for purposes of determining the amount of any updated Letter of Credit, the required Applicable Financial Information shall be as set forth in the following section 20(d)(iii)(2); and

      2. to the extent the Buyer is not party to an ABL Facility, no later than the fifteenth day of each calendar month, delivery to Seller of an unaudited balance sheet or inventory report, prepared in accordance with GAAP, setting forth the value of inventory of the Buyer and its subsidiaries prepared on a consolidated basis, prepared as of the end of the month most recently then ended.

**21. Survival of Representations and Warranties.**

All of the representations, warranties and other undertakings, as well as rights and remedies under the Agreement, will survive the termination of the Agreement, the termination of any Contract created under the Agreement, and any inspection, testing, acceptance, payment or use of the Goods provided under the Agreement; provided that in the case of Section 2(c), such survival shall be limited to the terms set forth therein. Such representations, warranties, and undertakings, rights and remedies will inure to the benefit of the parties and their respective affiliates and each their successors, permitted assigns and customers.

**22. Limitation of Liability.**

EXCEPT IN THE CASE OF GROSSLY NEGLIGENT OR INTENTIONAL MISCONDUCT, UNDER NO CIRCUMSTANCES WILL SELLER BE LIABLE TO BUYER (INCLUDING, WITHOUT LIMITATION AS A RESULT OF ANY TERMINATION, CANCELLATION, REJECTION OR REVOCATION OF ACCEPTANCE OF THE AGREEMENT OR ANY CONTRACT OR OTHERWISE) FOR ANY AMOUNT IN EXCESS OF THE PURCHASE PRICE SET FORTH IN ANY CONTRACT FOR GOODS. ALL CLAIMS FOR INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, WHETHER BASED UPON THEORIES OF CONTRACT, TORT, OR OTHERWISE, ARE HEREBY WAIVED BY BUYER.

**23. Assignment; Successors.**

Buyer may assign this Agreement to any person or entity only with prior written consent from Seller, which shall not be unreasonably withheld. Seller will neither assign the Agreement nor any Contract created under the Agreement nor subcontract the furnishing of any completed or substantially completed Goods without the prior written approval of Buyer, and no permitted assignment or subcontracting will relieve Seller of its obligations hereunder; provided, however, that Seller and Buyer may freely assign (without the consent of the other party) this Agreement and all Contracts entered into hereunder to a successor in connection with a sale of all or substantially all of the assets or business of Seller or Buyer to which this Agreement relates, whether by sale of assets or ownership interests, merger, or otherwise. The Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and permitted assignees. Notwithstanding anything to the contrary, no assignment by the Buyer shall be effective unless and until the assignee in respect thereof shall have confirmed its obligations under the Letter of Credit and the Buyer and the applicable assignee shall have delivered evidence reasonably satisfactory to Seller that the Letter of Credit shall remain in full force and effect and otherwise continues to satisfy the obligations in respect thereof as described in this Agreement and the assignee shall have affirmed its obligations in respect thereof.

**24. Severability**

The invalidity of any provision of the Agreement will not render invalid any other provision, it being the intention of the parties that the terms hereof will be construed in such fashion as to make all of such provisions valid and enforceable to the full extent permitted by applicable law.

**25. Waiver.**

No failure or delay on the part of Buyer to exercise any right, privilege or power under the Agreement shall operate as a waiver or relinquishment thereof; nor shall any single or partial exercise by Buyer preclude any other or further exercise thereof, or the exercise of any other right, privilege or power.

**26. Governing Law; Consent to Jurisdiction; Venue.**

This Agreement will be governed by and construed in accordance with the local laws of the State of New York, USA, without reference to its conflicts of laws principles. To the extent a court is precluded from applying those laws, the parties intend that the court apply the local laws of any other jurisdiction which has enacted the Uniform Commercial Code and bears an appropriate

relation to the transactions governed by this Agreement. The parties consent to the exclusive jurisdiction and venue of the courts of proper subject matter jurisdiction located in the City of New York, New York County, New York, USA for all purposes related to this Agreement or any contract entered into hereunder. Service of any process, summons, notice, or document by written means pursuant to Section 27 will be effective service of process for any action, suit, or proceeding brought against any party hereunder in any such courts. The United Nations Convention on Contracts for the International Sale of Goods will have no application to this Agreement or actions hereunder or contemplated hereby.

**27. Notices.**

Any notice required or permitted under the Agreement shall be given at the respective addresses for the parties indicated on the signature page of the Agreement (or as subsequently changed in a notice) by any commercially reasonable written or electronic means and, unless otherwise specified by the protocol adopted hereunder, will be deemed given when delivered in person, when electronic delivery is confirmed, when delivered by any reputable courier service, or two (2) days after being sent by registered or certified U.S. mail, postage prepaid, return receipt requested.

**28. English Language.**

This Agreement is executed in the English language and shall be deemed to comprise the language mutually chosen by the Parties. All notices, records, and other documentation to be delivered to or by Buyer hereunder shall be delivered in English. If the Agreement should exist in counterparts in more than one language, the English language version shall be the official version.

**29. Interpretation.**

The terms and conditions of this Agreement are the result of negotiations between the parties. The parties intend that this Agreement should not be construed in favor of or against any party by reason of the extent to which any party or its professional advisors participated in the preparation or drafting of the Agreement.

**IN WITNESS WHEREOF**, the parties, through their duly appointed and authorized representatives, have executed this Sourcing Agreement as of the day and year first written above.

**Buyer: La Senza International, LLC**

By:_______________________
Name: Michael Reinstein______
Title: Authorized Signatory______

**Seller: MGF Sourcing US, LLC**

By:_______________________
Name: Daniel Block
Title: VP - Finance & Asst Sec

 

# NYSCEF - New York County Supreme Court
# Confirmation Notice

The NYSCEF website has received an electronic filing on 01/10/2020 10:09 PM. Please keep this notice as a confirmation of this filing.

**657213/2019**
**MGF Sourcing US, LLC v. La Senza International, LLC et al**
**Assigned Judge: Marcy Friedman**

## Documents Received on 01/10/2020 10:09 PM

| Doc # | Document Type |
|---|---|
| 26 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF PROPOSED OSC/EXPARTE APP, Motion #001<br>Supplemental Affirmation of Lamina Bowen in Support of Plaintiff MGF Sourcing US LLC's Order to Show Cause to Seal |
| 27 | EXHIBIT(S) - REQUEST TO SEAL 1, Motion #001<br>Redacted Master Sourcing Agreement |
| 28 | EXHIBIT(S) - REQUEST TO SEAL 1, Motion #001<br>Highlighted Proposed Redactions - Master Sourcing Agreement |

## Filing User

Lamina Bowen | LAMINA.BOWEN@kirkland.com
601 Lexington Ave, New York, NY 10022

## E-mail Notifications

An email regarding this filing has been sent to the following on 01/10/2020 10:09 PM:

**LAMINA BOWEN - LAMINA.BOWEN@kirkland.com**
**TIMOTHY J. PASTORE - Timothy.Pastore@saul.com**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956 Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center, EFile@nycourts.gov**
Phone: (646) 386-3033 | Fax: (212) 401-9146 | Website: www.nycourts.gov/efile

A-00052

Page 1 of 1